UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL CARMICHAEL, <br><br> Plaintiff, <br><br> v. <br><br> TOWN OF STOUGHTON, <br> ROBIN GRIMM, DONNA MCNAMARA, <br> and BRIAN HOLMES in their individual <br> and official capacities, <br><br> Defendants. | Civil Action No.: _____ <br><br><br> **JURY DEMAND** |

**COMPLAINT**

I. <u>Introduction</u>

1.      This is an employment-related action brought by Lieutenant Daniel Carmichael, a member of the Stoughton Police Department ("Department"), against the Town of Stoughton ("Town"), Town Manager Robin Grimm, Chief of Police Donna McNamara, and Deputy Chief of Police Brian Holmes.

2.      In addition to his police work, Lt. Carmichael has been active in the Stoughton Police Superior Officers Union ("Union"), holding various officer and bargaining positions and ultimately becoming President of the Union in 2020. After years of a positive and harmonious relationship with the Defendants, in 2019 Lt. Carmichael found himself facing retaliation for exercising his constitutional rights to free speech and association in connection with his Union role, as well as engaging in whistleblower activity. As Lt. Carmichael's First Amendment and Whistleblower Activities (together, "protected activities") continued, so too did the Defendants' escalating pattern of retaliation.

3.      Defendants, *inter alia*, accused Carmichael of misconduct, reduced his paid time off, harassed him, initiated a lengthy unwarranted internal affairs ("IA") investigation into him, issued an internal affairs report containing false information intended to damage his credibility and reputation, disciplined him, unlawfully withheld public and personnel records from him, denied him a disciplinary appeal, reduced and/or denied him opportunities to earn overtime or compensatory time, reduced his job duties and managerial responsibilities, made multiple defamatory oral and written statements intended to harm his reputation, created a hostile work environment, and otherwise retaliated against him (all together, "retaliatory conduct").

4.      Through their retaliatory conduct, Defendants violated Lt. Carmichael's rights, Grimm, Holmes, and McNamara inflicted extreme emotional distress on him and interfered with his employment relationship with the Town,  Holmes defamed Lt. Carmichael and interfered with his right to privacy.

5.      The message from the Defendants to Lt. Carmichael is clear: engage in protected activities and you will suffer severe consequences.

II. <u>Parties</u>

6.      Plaintiff Daniel Carmichael is a male resident of Easton, Massachusetts, Bristol County. He is presently employed as a Lieutenant by the Stoughton Police Department, in Stoughton, Massachusetts, Norfolk County.

7.      Defendant Town of Stoughton is a municipal corporation organized under the laws of Massachusetts and has a principal place of business located at 10 Pearl Street, Stoughton, Massachusetts, Norfolk County. The Stoughton Police Department is a paramilitary law enforcement agency and a department of the Town of Stoughton.

8.     Defendant Brian Holmes is a male resident of Massachusetts with a last and usual residence in Stoughton, Massachusetts, Norfolk County. He is presently employed as Deputy Chief of the Stoughton Police Department, in Stoughton, Massachusetts, Norfolk County.

9.     Defendant Robin Grimm is a female resident of Rhode Island with a last and usual residence in Harrisville, Rhode Island, Providence County. She is presently employed as Town Manager of the Town of Stoughton, in Stoughton, Massachusetts, Norfolk County.

10.    Defendant Donna McNamara is a female citizen of Massachusetts with a last and usual residence in Sharon, Massachusetts, Norfolk County. She is presently employed as Chief of the Stoughton Police Department, in Stoughton, Massachusetts, Norfolk County.

### III. Facts

### *Lt. Carmichael's Brief Employment Background*

11.    Carmichael joined the Department as a patrol officer on January 2, 2013.

12.    On April 13, 2016, just three years after joining the Department, Carmichael was promoted to sergeant. He was later promoted to lieutenant on February 11, 2019.

13.    As a sworn officer with the Department, Carmichael has earned numerous formal commendations and awards from the Department, including 2015 Officer of the Year, 2016 Supervisor of the Year, two Lifesaving Medals, three Meritorious Unit Awards, a Public Service Award, Police Commendation, and two Letters of Merit.

14.    In the Department, the three lieutenants are the highest-ranking officers under the Chief and Deputy Chief.

15.    As a lieutenant, Carmichael is the shift commander/officer-in-charge ("OIC") of the midnight to 8 A.M. shift. In addition to that role, he maintained secondary duties he first had

as a sergeant, including, among others, grant management. He was also assigned new duties as the Department's Detail Supervisor, which included completing police detail billing/invoicing.

16.    Holmes has been a member of the Department since approximately 1997. Since 2017, he has served as Deputy Chief for the Department. In that role, he supervises the Department's employees, including Carmichael.

17.    McNamara has been a member of the Department since approximately 2001. Since 2016, she has served as Chief of the Department. In that role, she supervises the Department's employees, including Holmes and Carmichael.[1]

18.    Carmichael previously reported to McNamara as a patrol officer when McNamara was a sergeant and, subsequently, when she was promoted to lieutenant. McNamara expressed satisfaction with Carmichael's work during that time.

19.    Carmichael previously reported to Holmes as a patrol officer when Holmes was a sergeant. Holmes expressed satisfaction with Carmichael's work during that time.

20.    Prior to the events described herein, Carmichael's employment record was unblemished. He had never been disciplined or the subject of any internal affairs investigation.

### *Stoughton Police Department Background*

21.    From approximately 2004 to 2008, prior to Carmichael's employment, the Department was embroiled in repeated scandals and negative media coverage. Investigations by the FBI and Norfolk County District Attorney resulted in officers being criminally charged and

---

[1] When McNamara and Holmes were promoted to Chief and Deputy Chief, they had minimal supervisory experience. McNamara was a sergeant for two years and a lieutenant for less than one year. Holmes was a sergeant for four years, much of which was spent processing citizen firearms licensing applications. At the time, the Town had significantly lowered the minimum requirements for supervisory experience in comparison to its 2010 and 2013 postings for the same positions. For example, the Chief was only required to have a minimum of 1 year of supervisory experience instead of 7 years.

others forced to leave the Department. The high profile nature of these incidents drew public attention, particularly in the areas of internal affairs investigations.

22.      Subsequently, in 2010, a new police chief was hired and made significant improvements. He served until McNamara's 2016 appointment.

23.      Grimm has served as Town Manager for the Town of Stoughton since 2019. In that role, Grimm supervises McNamara and Holmes.

24.      The Town's Select Board ("Board") consists of five elected members and, according to the Stoughton Town Charter, "[is] the highest executive authority of the Town." The Board supervises, directs, and is the appointing/hiring authority for Grimm. The Board is also the appointing/hiring authority for McNamara.

25.      According to Department policy, "[McNamara] is the chief administrative officer of the Department and the final authority in all matters of fiscal management, policy, operations and discipline."

26.      According to Department policy, "[Holmes] oversee[s] the day to day operations and business of the Police Department" and is the "Commanding Officer of the Internal Affairs Unit."

27.      According to the Town Charter, Grimm is "the chief administrative officer in the executive branch of the Stoughton town government" and "shall . . . be the administrative head of all departments of the Town."

28.      Grimm is the Appointing Authority for the Department's sworn police officers, including Holmes, and is the Town's bargaining representative to the Union.

29.      Grimm, McNamara, and Holmes have final policymaking authority for the Town.

### *Lt. Carmichael's Union Role*

30.    In approximately 2018, Carmichael was elected as the Secretary/Treasurer of the Union. He was later elected as Union President in February 2020. Since 2018, including his time as Secretary/Treasurer, he handled most of the Union's business, including many functions typically associated with the Union President.

31.    The Union represents the Department's sergeants and lieutenants.

32.    Carmichael was also elected to the Union's Bargaining Committee starting in 2016.  On that Committee, he has served as lead spokesperson since 2019.

33.    The Bargaining Committee is comprised of four elected Union members who represent the Union during Collective Bargaining Agreement ("CBA" or "Contract") negotiations.

34.    It was well known, including by Defendants, that Carmichael was one of the most, if not the most, active and outspoken advocates for the Union.

35.    Nearly all of Carmichael's interactions with Defendant Grimm have been in his capacity as a representative of the Union and hers as the Town's bargaining representative.

### *First Protected Acts Resulting in Retaliation*
### *Transgender Policy, Injury Leave Benefits, and Fentanyl Report*

36.    In early February 2019, Carmichael was approached by an officer, who is transgender. The officer expressed concern about having been disciplined for alleged violations of the Department's grooming policy and other workplace rules due to their[2] gender expression. The officer told Carmichael that a sergeant had counseled them about their grooming/hair style and related issues over their uniform. The officer asked Carmichael to help, particularly in

---

[2] Carmichael is using gender neutral pronouns "they/their" to refer to this officer, whose transgender status is not known by the public and thus their name is not being used.

getting the Department to institute a Transgender Employee Policy. The officer also stated that they had sought help on this matter from McNamara and/or Holmes for months but to no avail. Carmichael agreed to help.

37.     Within several days, Carmichael spoke with Holmes about the officer's discipline, concerns for future discipline, and the urgent need for a Transgender Employee Policy. During their meeting, Holmes appeared annoyed with Carmichael and stated he didn't understand why Carmichael was bringing this to him, but that he would speak with McNamara.

38.     Between February and May 2019, Carmichael spoke with the transgender officer several times, who stated they had not heard anything from the Department.

39.     Between February and approximately May 2019, Carmichael also followed up with Holmes several times about the need for a Transgender Employee Policy.

40.     In a separate Union matter during an overlapping timeframe, in April 2019, Carmichael contacted the Town's insurer regarding their months long failure to either approve or deny coverage for a surgery required for a sergeant who had been injured on duty. The delay had caused the sergeant's physical condition to deteriorate and he experienced significant and increasing pain. The sergeant asked Carmichael for help. Carmichael provided written notice that the Town's continued failure to take action to approve or deny treatment would result in the Union pursuing legal action.[3]

41.     In approximately April 2019, the transgender officer reported to Carmichael that the Department was finally working on a policy and thanked him for his help.

42.     On June 12, 2019, the Department issued a Transgender Employee Policy.

---

[3] Police officers receive benefits similar to workers compensation under M.G.L. c. 41, §§ 100, 111F, commonly known as injured in the line of duty benefits.

43.    On June 13, 2019, Holmes called Carmichael into his office and berated Carmichael over a number of alleged issues that Holmes claimed spanned from November 2018 to June 2019. During this interaction, Holmes appeared angry through his facial expressions.

44.    Among the topics Holmes berated Carmichael about was a counseling session Carmichael recently had with one of his subordinates, Sergeant Thomas McNulty ("McNulty").

45.    Carmichael had previously notified Holmes that he verbally counseled McNulty for directing patrol officers to leave fentanyl inside of a home after they responded there for an opiate overdose. The fentanyl remained in the home for several days until another alert officer became aware of this, went to the home, retrieved and secured the fentanyl, and reported McNulty to Carmichael. Carmichael had not been working at the time of the original incident.

46.    Holmes did not mention anything specific Carmichael had done wrong with the fentanyl counseling of McNulty, but rather, angrily peppered him with questions about it.

47.    Carmichael reasonably believed that leaving fentanyl, which had caused an opiate overdose, inside of a home with other residents, was in violation of law or regulation or posed a risk to public health or safety.

48.    Carmichael had never previously been made aware that the topics Holmes cited to him were issues. During the timeframe Holmes referenced, Carmichael had been publicly and privately praised by Holmes and McNamara and promoted to lieutenant.

49.    Holmes verbal attack on June 13 was motivated by Carmichael's protected activities.

50.    Carmichael had never had an interaction like this with Holmes or any other supervisor previously. Confused and shaken by the interaction with Holmes, Carmichael called for another supervisor to relieve him and went home.

51.     As a result, Carmichael did not receive four hours of overtime pay that he otherwise would have had he been able to complete this shift.

### *Other Duty Days Retaliation*

52.     Other duty days ("ODD") is a type of non-contractual, non-accruing duty status that officers are placed on in the Department's scheduling system when participating in certain Department-related activities.

53.     On September 15, 2018, then-Sgt. Carmichael was on approved ODD duty status while taking the promotional examination for lieutenant.

54.     Nine months later, on June 26, 2019, McNamara sent a letter[4] stating that she and Holmes were unaware that Carmichael had been on ODD duty status for the 2018 promotional exam. McNamara referred to an order regarding ODD that was issued on January 9, 2019 – months after the exam - as a basis for her decision.

55.     McNamara informed Carmichael that his paid time off would be reduced by eight hours for the ODD.

56.     McNamara seeking to reduce Carmichael's paid time off was motivated by his protected activities.[5]

### *Reduction of Overtime Opportunities and Managerial Responsibilities*

57.     From 2016 until approximately June 2019, Carmichael had a well-established understanding and practice with the Department that he would receive overtime pay or

---

[4] On May 31, 2019, the Union sent Chief McNamara a letter asking for clarification on the Department's practice with respect to ODD.

[5] After the Union filed a grievance of this issue and later submitted a complaint to the Department of Labor Relations (DLR), the DLR issued a Complaint of Prohibited Practice, finding probable cause that the Town violated M.G.L. c. 150E § 10(a)(3) and 10(a)(1) by discriminating and retaliating against Carmichael by seeking to reduce his paid time off for the ODD based on his union activity.

compensatory time off for work performed in addition to his normal scheduled hours as a patrol supervisor, without the need to seek preapproval for the overtime. This additional time was used to complete his secondary duties, which included, among other matters, grant management tasks and, after his February 2019 promotion, detail billing/invoicing.

58.     It was mutually understood that these duties could not reasonably be completed during his regular work week.

59.     After approximately June 2019, Holmes informed Carmichael that he would be required to obtain preapproval from him or McNamara before working the additional hours. Carmichael was also told to modify his regular schedule to avoid incurring overtime.

60.     With the new restrictions imposed by Holmes, Carmichael could not continue to keep up with his secondary duties properly.

61.     As a result of Holmes' actions, Carmichael was forced to relinquish his grant duties. The Department assigned a sergeant to take over those duties following a transition period and training by Carmichael.

62.     Prior to this decision, Carmichael earned approximately 100 hours in overtime or 150 hours in compensatory time[6] annually from the grant duties.

63.     Until September 2020, Carmichael also lost overtime compensation earned through his detail billing and invoicing assignments, which could not be completed during his regular work hours.

64.     Other supervisors who were not engaged in protected activities did not have their additional hours reduced and continued to be provided with weekly overtime opportunities to complete their secondary duties without requiring preapproval.

---

[6] Compensatory time off is earned at the rate of 1.5 times the number of hours worked, while this is already calculated into the overtime rate.

65.     McNamara later eliminated and/or reduced Carmichael's involvement with other secondary job duties he had held, including maintaining the Department's radios, cruiser laptops, and also removed him as an administrator on the Department's Verizon Wireless account.

66.     The decision to restrict Carmichael's ability to earn overtime and compensatory time in the manner both Carmichael and other Detail Supervisors had previously been allowed by the Town, and to remove him from his other job duties, was motivated by a retaliatory intent against Carmichael's protected activities.

### *Order to Maintain Secret Personnel Records*

67.     In early July 2019, Carmichael objected to an order by Holmes to monitor the activities of Department employees using a red calendar book that Holmes provided. Holmes told Carmichael that he had used information from a similar book that he maintains to put the officer who requested the transgender policy out on administrative leave a year earlier.

68.     Carmichael reasonably believed that the information Holmes ordered him to record in the calendar book constituted a personnel record under M.G.L. c. 149, § 52C.

69.     Carmichael sent an email to Holmes questioning the order, including specifically about disclosures to employees, whether the journal constituted a personnel or public record, and the Town's intended use for any such information recorded.

70.     Between July 31, 2019 and October 8, 2019, Holmes responded to Carmichael by berating him over email. Among other things, Holmes accused him of "struggling with a very simple concept," as well as "struggling a bit with your role as a shift commander, particularly if this strikes you as a foreign concept," and engaging in "artfully crafted pushback."

71. Holmes avoided answering the questions Carmichael posed, stating, "the rest of your questions can be addressed with me at shift change when I see you again." Despite this, Holmes never followed-up or spoke with Carmichael again on this topic.

72. Carmichael objected to this activity or practice as he believed the use of the calendar books to monitor employee's conduct violated their rights under M.G.L. c. 149, § 52C.

73. Upon information and belief, Holmes' hostile and evasive responses to Carmichael's questions were intended to intimidate Carmichael.

74. Carmichael never recorded anything in the calendar book.

### Holmes' Continuing Retaliation and Bias Against Carmichael

75. On September 8, 2019, Holmes ordered Carmichael and a patrol sergeant to perform a hospital watch on an arrestee themselves rather than assign their patrol officers to the hospital watch per Department practice and policy. This prevented Carmichael from performing his regular oversight duties on his shift and created significant public safety concerns.[7]

76. Upon information and belief, no other OIC or patrol supervisor had been ordered to perform hospital watch duty before or since.

77. On November 6, 2019, Holmes verbally insulted Carmichael in front of three subordinates when he learned that Carmichael had ordered ten details for an upcoming Veterans' Day Parade. He later accused Carmichael (falsely) of not following his instructions regarding the number of details.

78. The decisions and actions described above by Holmes regarding hospital watch and the Veterans Day Parade were motivated by Carmichael's protected activities.

---

[7] For example, Carmichael could have been unable to terminate a police pursuit because his radio would not work (due to widely known issues using police radios in the hospital), or Carmichael would have been unable to respond to an individual in a police holding cell attempting to harm themselves, or, lastly, if he was unable to respond to a critical incident such as an officer involved shooting.

### Retaliatory Internal Affairs Investigation into Lt. Carmichael

79.     On November 28, 2019, Carmichael (serving as OIC) discovered that Sgt. Thomas McNulty, the on-duty patrol supervisor, did not respond to a 9-1-1 call for domestic violence because he had been sleeping in his cruiser. Mostly new and/or inexperienced patrol officers were working and responded to the domestic call without McNulty.

80.     Carmichael later located McNulty in his police cruiser in the rear of the station; he initially attempted to wake him, but when that failed, and after observing that McNulty appeared to be otherwise all right, Carmichael decided to avoid a potential confrontation in the parking lot at 4:30 a.m. and waited for the day shift lieutenant to arrive several hours later.[8]

81.     McNulty was well known in the Department as having a volatile temper and being confrontational. Carmichael had previous confrontations with him.

82.     In a similar disciplinary matter prior to Carmichael's protected activities, Holmes advised him to wait to speak with an employee until he could do so with another supervisor.

83.     The Department's Discipline and Accountability Policy states: "[a supervisor's] familiarity with his or her personnel provides him or her the best opportunity to observe or foresee disciplinary problems and to determine the most appropriate methods to deal with them," and further states, "[employee problems may be addressed] at the time of the concern, after report/incident review by supervisor (sic), or at a later time, if discussing the concern will be better understood and accepted."

84.     While Carmichael waited for the dayshift supervisor, he notified McNamara by phone.[9] Carmichael explained what had occurred, including his delay in confronting McNulty to

---

[8] The domestic violence call had already concluded at the time Lt. Carmichael found McNulty.

[9] Holmes was on vacation when this occurred and the Department issued instructions to contact McNamara with issues.

avoid a potential confrontation. McNamara seemed supportive of and expressed no concerns about Carmichael's actions at that time. Carmichael also informed the Day Shift commander when he arrived, who agreed that no meeting with McNulty should occur that day.

85.     On November 30, 2019, Carmichael submitted a written report about McNulty's actions to Holmes and copied McNamara.

86.     Under the Department's policy on discipline and accountability, lieutenants have the authority to "counsel, orally reprimand, relieve from duty, and recommend a formal written reprimand or more serious disciplinary action."

87.     On December 3, 2019, Holmes ordered Carmichael to provide more information, in writing, regarding his report about McNulty. Based on Holmes' tone, demeanor, and manner of questioning, Holmes gave Carmichael the impression that he was the one in trouble.

88.     Following this, Carmichael noted other changes in the way McNamara and Holmes acted towards him, including avoiding nearly all contact with him or telling other officers to provide him with instructions from them, rather than speaking with him themselves.[10]

### *Protected Activities Immediately Preceding the Internal Investigation*

#### Contract Negotiations

89.     The Town and the Union were bargaining over a successor contract from March 2019 until April 2021. The contract had expired on July 1, 2019.

90.     While negotiations for a new contract between the Union and Town initially appeared amicable, they eventually turned contentious, particularly with respect to wages.

---

[10] This still occurs to this day.

91.     In December 2019, as the result of a public records request by Carmichael, he learned that McNamara and Holmes both received new employment agreements with the Town, receiving 11% and 20% increases, respectively, over the course of their three-year contracts.

92.     Carmichael provided this information to other union officials and it was posted to the union bulletin board.[11] The Town was aware that Carmichael was the original requestor of the public records containing this information.

93.     The Enterprise newspaper later published an article about the large pay increases.

### *Carmichael First Seeks Medical Treatment*

94.     Based on the interactions and conversation Carmichael had with McNamara and Holmes between December 3, 2019 and January 2020, Carmichael became increasingly concerned that the manner in which the Department was handling his McNulty report was much different than its treatment of other employee/personnel issues he had been involved in prior to his protected activities.

95.     As a result of McNamara and Holmes' retaliatory conduct, Carmichael began to experience acute stress, weight loss, difficulty sleeping, and other related symptoms. On January 23, 2020, Carmichael went to his primary care doctor and was examined for anxiety. Carmichael had never been treated for anxiety previously.

96.     On January 27, 2020, Carmichael went back to his primary care doctor for the same issue, which had become more intense.

### *Internal Affairs Investigation of Lt. Carmichael*

97.     On January 29, 2020, the Town – through Holmes – hand-served Carmichael a letter notifying him that he was under investigation for allegedly engaging in misconduct during

---

[11] The Union bulletin board is a large display case attached to the wall in the roll call/reports area of the Department and in highly visible and frequently trafficked area by all Department personnel.

the McNulty incident on November 28, 2019. The Town did not state with any specificity the possible policy violations committed by Carmichael.

98.     When Carmichael and the Union asked repeatedly, pursuant to the Department's Internal Affairs Policy,[12] what allegations were being made against him, the Town failed and refused to provide this information.[13]

99.     The decision to investigate Carmichael and not to inform him of the allegations against him was motivated by a retaliatory animus for his protected activities and intended to chill his First Amendment activities.

100.    Beginning in early February 2020, Carmichael sought additional medical treatment for worsening symptoms caused by his treatment by the Defendants. He was diagnosed with major depressive disorder and panic attacks and was prescribed medication. Prior to this, Carmichael had never experienced any mental health problem and had never been prescribed medication to treat a mental health issue.

101.    In approximately February 2020, Carmichael was informed that some officers were purposefully avoiding speaking to and associating with him as a result of the ongoing internal affairs investigation. Carmichael learned that the officers believed that he was "next on the chopping block [by Holmes and McNamara]."

102.    Upon information and belief, in the beginning of March 2020, Holmes told two supervisors that the reason he initiated the internal investigation into Carmichael was because "[Carmichael] went nuclear" about the McNulty incident. Holmes wrote in his later obtained

---

[12] The Department's Internal Affairs Policy, Employee Notification of Filed Complaint, Section 52.2.5, provides that "employees shall receive a written statement of the allegations. The employee will be advised of their rights and responsibilities relative to the investigation."

[13] The DLR later issued a complaint against the Town, finding probable cause that they violated the law by failing to disclose the allegations.

report that he initiated the IA investigation, "based on [the] change in plans [of] Carmichael not having a counseling session and in fact writing McNulty up."

103.    Upon information and belief, in approximately February 2020, Holmes approached another Stoughton officer at a local bar and discussed IA investigations. Holmes then stated, "I could bury anyone in this Department at any time. People need to remember that."

### *Protected Activities Immediately Preceding Retaliatory Reprimand*

#### *COVID-19 Report*

104.    On March 21, 2020, Carmichael sent a letter to McNamara on behalf of the Union concerning injured leave for officers exposed to or infected by COVID-19. This was signed jointly with the Patrol Union President. A copy was also placed on the union bulletin board.

105.    On March 25, 2020, Carmichael sent a letter to McNamara and Grimm on behalf of the Union, protesting she and Holmes' ongoing mistreatment of and retaliation against Lieutenant Daniel McGowan ("McGowan"), Union Vice President, for his protected activities. The letter stated that Carmichael had directed Union Counsel to file a complaint with the DLR for these acts. A copy was placed on the union bulletin board.

106.    On March 26, 2020, Carmichael sent a letter to Grimm criticizing the Town and specifically Holmes and McNamara for failing to protect the department's employees from COVID-19, which, at that time, had infected at least two police officers and left several more in self-quarantine. The Board received a copy of this letter.

107.    The Enterprise newspaper obtained a copy of the Union's letter and published an article on April 1, 2020 titled, "No Transparency, No Plan – Stoughton Police Union Faults Chief Amid Department's Outbreak of Coronavirus."

### *McNamara Issues Retaliatory Reprimand to Carmichael*

108.    McNamara ordered Carmichael to meet with her on March 27, 2020.[14] Carmichael requested the presence of a union representative but McNamara denied the request.

109.    Carmichael arrived on March 27 and entered McNamara's office, she immediately stated, "no discussion, no debate" and handed him an envelope containing a letter.

110.    The letter was a written reprimand issued to Carmichael. In summary, it stated that Carmichael "failed to fulfill [his] duties as a supervisor" by delaying in confronting McNulty and, "ignored the possibility that the Sergeant . . . was experiencing [a] medical emergency."

111.    McNamara was motivated to issue the reprimand because of Carmichael's protected activities and at the recommendation of Holmes, and, upon information and belief, Grimm, all of whom who had retaliatory motives due to Carmichael's protected activities. The reprimand was intended to chill Carmichael's exercise of First Amendment activities.

112.    The DLR later issued a charge of prohibited practice against the Town, finding probable cause that the Town retaliated against Carmichael for his protected Union activity by issuing him the written reprimand.

### *Retaliation Through Denial of Records*

<u>Refusal to Provide Records</u>

113.    Throughout March and April 2020, the Town and Department refused to provide Carmichael with documents that constituted his personnel record pursuant to M.G.L. c. 149, § 52C. During that same period, the Town and Department similarly refused to produce documents concerning the Internal Affairs investigation into his actions, which are public records, and the Department's own Internal Affairs Policy states that employees have a right to access.

---

[14] McNamara's order to Carmichael to meet with her on March 27 occurred on March 23.

114.     Eventually, in response to a public records request by Carmichael, the Town provided him with a $200 fee estimate for his internal affairs file. The Town claimed it would take McNamara or Holmes ten hours to "search for and locate [the] records."

115.     Upon information and belief, the Town provided records without charge or for a lesser charge for multiple requestors with similar or more intensive records requests. The other requestors were not engaged in protected activities.

116.     Carmichael, his attorney, and his Union sent numerous communications, totaling approximately ten written requests, for these records, but the Town refused to provide them.

117.     The Town's refusal to provide copies of and access to records, as well as its attempt to charge excessive fees, was motivated by bias and retaliatory intent against Carmichael for his protected activities and was designed to conceal the contents of the records.

118.     The denial of the records request and excessive fees was intended to chill Carmichael's exercise of First Amendment rights.

**Holmes' Retaliatory Internal Investigation Report**

119.     Through repeated public records requests and the threat of legal action, Carmichael's counsel was eventually able to obtain a redacted and incomplete copy[15] of Holmes' internal affairs report about Carmichael and McNulty.

120.     A comparison of Carmichael and McNulty's interview transcripts shows disparate treatment in the investigations by Holmes of alleged misconduct by each. The transcript of Holmes' interview of McNulty is a mere thirteen pages of a conversational tone, with Holmes even declaring the interview "over" on page five, while the transcript of Holmes' interview of Carmichael spans thirty-five pages of aggressive, suspicious, and sometimes hostile questioning.

_____

[15] The report was missing several numbered exhibits and other requested documents.

121.    In the context of McNulty's sleeping, Holmes' report states that the "practice" of the Department for the "last 22 years" is "if personnel need to take a break or rest, they should do so." "Break" and "rest" are used in Holmes' report as euphemisms for sleeping on duty.

122.    The internal affairs report regarding McNulty demonstrates bias and retaliatory motive by Holmes against Carmichael. Holmes coached McNulty through his answers, referred to him as "Tommy," called McNulty, "credible . . . his responses direct and unwavering," "accepting of his role in this matter." Conversely, Holmes characterized Carmichael as "less than forthcoming and non-credible."

123.    The substance of Holmes' interviews does not support these characterizations. For example, during McNulty's interview, he made the statements: "I heard the entire call," "I heard the entire call. I listened to the entire call," "I didn't sleep through the call;" however, just a short time later he stated: "Hey, I'm sorry. Hey, I fell asleep. I – I get tired," "I'll try not to fall asleep anymore or doze off. I'll try not to. Shit happens." Further, he repeatedly stated, "this is bullshit," "this is fuckin' bullshit," and similar statements throughout his interview.

124.    Despite McNulty's contradictory statements, Holmes found that McNulty was "direct and unwavering," "credible," and "accepting of his role," while Carmichael was not.

125.    Findings of lack of credibility can be extremely harmful and even career-ending for a police officer. By finding Carmichael not credible in an official Department investigation, Holmes has harmed Carmichael's ability to perform his duties and advance in his career.

*Defamatory Statements in Holmes' Internal Affairs Report*

126.    Holmes' internal affairs report on Carmichael contains false and misleading assertions about Carmichael and statements in direct conflict with the transcripts of Carmichael and McNulty's interviews. At least two statements are defamatory.

127.    Holmes stated in his internal affairs report" "Carmichael was unable to recall conversations with [the union officials]," and concluded that this was "non-credible."[16]

128.    A review of the interview transcript and circumstances surrounding Holmes' investigation of this claim reveals Holmes' statement to be untrue.

129.    Holmes also stated in the report: "[Carmichael] was unable to recall a conversation that took place in [McNamara's] office shortly after he was promoted . . ." and concluded that this was "non-credible."

130.    A review of the interview transcript and circumstances surrounding Holmes' investigation of this claim reveals Holmes' statement to be untrue.

131.    Holmes published the report to McNamara and possibly others in the Town. In addition, Holmes' report and findings will be published to the POST Commission and listed in their publicly searchable database.[17] This could lead to Carmichael's decertification as an officer.

132.    Holmes published these false and misleading statements for a spiteful, malignant purpose unrelated to the legitimate interest of the Department.

133.    Holmes' false and misleading findings will have a devastating impact on Carmichael's reputation and credibility for the remainder of his career and his ability to maintain employment as a police officer, seek future promotions, or transfers.[18]

---

[16] The DLR later issued a complaint of prohibited practice against the Town finding probable cause that Holmes violated the law by interrogating Carmichael about his discussions with these Union Officials, a violation of G.L. c. 150E § 10(a)(1).

[17] Chapter 253 of the Acts of 2020, An Act Relative to Justice, Equity, and Accountability in Law Enforcement in the Commonwealth, established the Massachusetts Peace Officer Standards and Training Commission ("POST"). POST is authorized by law to take action against an officer's certification to work as a police officer, up to revocation, for a variety of reasons, including credibility issues.

[18] For instance, under a policy proposed by the Norfolk County District Attorney's Office policy, known as the "Brady/Giglio policy," that office must disclose information concerning an internal police investigation that includes a finding against a law enforcement witness for conduct implicating untruthfulness or dishonesty.

### *Detrimental Effects on Lt. Carmichael's Health*

134.    Carmichael was out of work on sick leave for approximately eleven days from January 2020 to February 2020, due to stress and illness caused by Holmes and McNamara's retaliatory conduct toward him.

135.    Prior to this, during the entire period of his employment with the Town, he had only used six sick days in 2015 for an excused medical procedure.

136.    During the Department's internal investigation of Carmichael, several coworkers expressed concerns about Carmichael's health, including obvious weight loss, uncharacteristic use of sick leave, depressed mood, and apparent stress.

137.    Carmichael suffered headaches, difficulty sleeping, anxiety, panic attacks, major depressive disorder, and other related issues.  He continued to receive medical treatment and was prescribed medication.

### *Holmes' Interference with Lt. Carmichael's Privacy*

138.     Upon information and belief, while the internal affairs investigation into Carmichael was ongoing, Holmes contacted several individuals and disclosed the existence and details of the investigation into Carmichael.

139.    Holmes had no legitimate law enforcement or business reason to discuss the investigation with these individuals.

140.    Further, Holmes violated Department policy in disseminating this information. The Internal Affairs Policy provides: "It is essential that the process [of internal affairs investigations] not only be lawful, but confidential as well.  This necessitates strict confidentiality and full adherence to procedure."

141.    Holmes' disclosure of this private information caused Carmichael extreme distress, including anxiety, depression, and embarrassment.

### The Town's Treatment of Other Department Employees

142.    Between 2016 and today, numerous officers have violated Department policies through on-duty conduct without facing discipline or internal investigation. These officers were not engaged in protected activities.

143.    In one of the most shocking examples of the Defendants' conduct, in 2019, a lieutenant reported to Holmes that a sergeant may have fabricated portions of a police report leading to the arrest of two black men. While Holmes and McNamara knew about the alleged misconduct immediately, they permitted the sergeant to continue his duties, including participating in drug investigations, testifying in court, and even selecting him for a hiring panel for new police officers, while the lieutenant faced retaliation and discipline. As a result, the two men were incarcerated pending trial and indicted based, in part, on the sergeant's testimony.

144.    In contrast, at least five Department employees who engaged in protected activities during the same timeframe were subjected to internal affairs investigations, discipline, negative credibility findings or other retaliatory conduct. One employee was forced to retire as a result, while another has been subjected to multiple IA investigations, with the DLR issuing a Complaint of Prohibited Practice concerning the Town's retaliation against him.

### Lt. Carmichael's Continuing Protected Activity and Retaliation After the Reprimand

145.    On July 31, 2020, Carmichael learned that he had been denied overtime for a training class. The Department's decision to refuse to compensate Carmichael with overtime pay, although it paid overtime to other sworn officers attending similar trainings, was retaliatory.

146.     Throughout mid-2020 and into 2021, the Union wrote to Grimm and the Board on multiple occasions making them aware of issues within the Department and repeatedly asked for help. Among the many issues the Union wrote about were the following: concerns over poor leadership and communication, harassment and mistreatment of employees, "weaponizing" and abuse of internal affairs and discipline, retaliation against union officials, and the Department headed toward repeating its tumultuous 2004-2008 past and the public scrutiny that would follow. Carmichael contributed to and was the public face of these communications.

147.     In August 2020, the Enterprise newspaper published an article titled, "Stoughton Police Mired in Conflict Amid Accusations of 'Toxic' Workplace, Misconduct, and Retaliation."

148.     In September 2020, Holmes and McNamara falsely accused Carmichael of submitting the Department's detail invoicing/billing late and questioned his request for overtime.

### *Municipal Liability*

149.     Upon information and belief, the conduct or actions by Defendants taken against Plaintiff in response to his First Amendment activity is customary of a pattern or practice by the Town through its officers with final decision making authority.

150.     It is the custom or practice of Grimm, Holmes, and McNamara to retaliate against police officers who exercise their rights as members of the Union to protected activities under the First Amendment.

151.     This custom and practice by the Town violated Plaintiff's rights under the First Amendment.

## COUNT I
## RETALIATION BASED ON FIRST AMENDMENT – 42 U.S.C. § 1983
### (Individual Defendants)

152.    The Plaintiff repeats and reiterates the allegations of the foregoing paragraphs 1 through 151 inclusive, and incorporates them by reference herein.

153.    Plaintiff is guaranteed the right to free exercise of speech and association under the First Amendment.

154.    By their conduct, as more particularly described above, the Defendants retaliated against the Plaintiff for exercising rights under the First Amendment in violation of 42 U.S.C. § 1983, by *inter alia,* accusing Carmichael of misconduct, reducing his paid time off, harassing him, initiating a lengthy unwarranted internal affairs investigation into him, issuing an internal affairs report containing false information intended to damage his credibility and reputation, disciplining him, unlawfully withholding public and personnel records from him, denying him a disciplinary appeal, reducing and/or denying him opportunities to earn overtime or compensatory time, reducing his job duties and managerial responsibilities, making multiple defamatory oral and written statements intended to harm his reputation, creating a hostile work environment, and otherwise retaliating against him because of his exercise of his First Amendment rights.

155.    Defendants, through their actions described above, attempted to chill Plaintiff's exercise of his First Amendment rights.

156.    The Defendants are liable to the Plaintiff for the violations of law set forth above.

157.    The Defendants' conduct, as more particularly described above, has been egregious and outrageous.

158.     The retaliation more particularly described above has damaged the Plaintiff and has caused lost income, severe emotional distress, reputational harm, and other damages to be proven at trial.

## COUNT II
## FIRST AMENDMENT – MONELL
## (TOWN OF STOUGHTON)

159.     The Plaintiff repeats and reiterates the allegations of paragraphs 1 through 158 and incorporates them by reference herein.

160.     At all times described herein, Holmes, McNamara, and Grimm each had final policymaking authority for the Town.

161.     At all times, it has been the custom or practice of Grimm, Holmes, and McNamara to retaliate against police officers who exercise their rights as members of the Union to protected activities under the First Amendment

162.     The Town executed this custom and practice by retaliating against Plaintiff in response to his exercise of First Amendment rights.

163.     The Town's conduct has been extreme and outrageous.

164.     As a result, Plaintiff suffered damages in the form of lost income, severe emotional distress, reputational harm, and other damages to be proven at trial.

## COUNT III
## MASSACHUSETTS WHISTLEBLOWER ACT – M.G.L. c. 149, § 185
## (Town of Stoughton)

165.     The Plaintiff repeats and reiterates the allegations of the foregoing paragraphs 1 through 164 and incorporates them by reference herein.

166.     The Plaintiff disclosed to a supervisor an activity, policy, or practice that he reasonably believed was in violation of law or regulation when he disclosed to Holmes a

transgender officer being disciplined and concerned about future discipline due to their gender expression and advocating to establish a transgender employee policy.

167.    The Plaintiff disclosed to a supervisor an activity that he reasonably believed was in violation of law or regulation or posed a risk to public health or safety when he disclosed to Holmes that he had verbally counseled McNulty for directing patrol officers to leave fentanyl inside of a home after an opiate overdose had occurred.

168.    The Plaintiff disclosed to a supervisor an activity, policy, or practice that he reasonably believed was in violation of law or regulation or posed a risk to public health or safety when he reported concerns about COVID-19 to McNamara and Grimm.

169.    The Plaintiff disclosed to a supervisor an activity or practice that he reasonably believed was in violation of law or regulation or posed a risk to public health or safety when he reported McNulty, the patrol supervisor, failing to respond to a domestic violence 9-1-1 call because he was sleeping on duty for several hours.

170.    The Plaintiff objected to an activity, policy, or practice that he reasonably believed was in violation of law or regulation when he objected to and questioned Holmes' order to create and maintain secret personnel records regarding other employees.

171.    The Plaintiff objected to an activity that he reasonably believed was in violation of law or regulation or posed a risk to public health or safety when he contacted the Town about the Town's refusal to process the officer's injured in the line of duty application, causing the sergeant's physical condition to deteriorate.

172.    The Plaintiff provided information to a public body conducting an investigation into a violation of law or regulation when he appeared and provided information to the DLR

hearing officer at the February 26, 2020 in-person investigation regarding the Town's violations of G.L. c. 150E § 10(a)(3) and 10(a)(1).

173.    Plaintiff provided written notice to a supervisor and an opportunity to correct the activity when he filed written step two grievances with McNamara and Grimm in August 2019. McNamara and Grimm were also provided written notice when they received copies of the DLR complaint.

174.    The Defendant Town of Stoughton retaliated against Plaintiff for this protected conduct by, *inter alia*, accusing Carmichael of misconduct, reducing his paid time off, harassing him, initiating a lengthy unwarranted internal affairs investigation into him, issuing an internal affairs report containing false information intended to damage his credibility and reputation, disciplining him, unlawfully withholding public and personnel records from him, denying him a disciplinary appeal, reducing and/or denying him opportunities to earn overtime or compensatory time, reducing his job duties and managerial responsibilities, making multiple defamatory oral and written statements intended to harm his reputation, creating a hostile work environment, and otherwise retaliating against him as a result of his whistleblower activity.

175.    By its conduct, as more particularly described above, the Defendants violated M.G.L. c. 149, § 185(b)(1), (b)(2), and (b)(3).

176.    The Defendants are liable to the Plaintiff for the violations of law set forth above.

177.    The Defendants' conduct, as more particularly described above, has been egregious and outrageous.

178.    As a result, Plaintiff suffered damages in the form of lost income, severe emotional distress, reputational harm, and other damages to be proven at trial.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Grimm and Holmes, in their individual capacities)

179.    The Plaintiff repeats and reiterates the allegations of the foregoing paragraphs 1 through 178 and incorporates them by reference herein.

180.    The Defendants had a duty to refrain from intentionally inflicting emotional distress on the Plaintiff.

181.    Notwithstanding its duty, the Defendants intentionally inflicted emotional distress on the Plaintiff, in violation of law.

182.    By their conduct, as more particularly described above, the Defendants violated by law, by *inter alia*, accusing Carmichael of misconduct, reducing his paid time off, harassing him, initiating a lengthy unwarranted internal affairs investigation into him, issuing an internal affairs report containing false information intended to damage his credibility and reputation, disciplining him, unlawfully withholding public and personnel records from him, denying him a disciplinary appeal, reducing and/or denying him opportunities to earn overtime or compensatory time, reducing his job duties and managerial responsibilities, making multiple defamatory oral and written statements intended to harm his reputation, placing his certifications as a police officer and emergency medical technician at risk of future revocation, creating a hostile work environment, and otherwise retaliating against him because he engaged in protected activities.

183.    The Defendants are liable to the Plaintiff for the violations of law set forth above.

184.    The Defendants' conduct, as more particularly described above, has been intentional and reckless.

185.    The Defendants' conduct, as more particularly described above, has been egregious and outrageous.

186.    The Defendants' conduct has caused severe emotional and physical damage to the Plaintiff.

## COUNT V
## DEFAMATION
### (Holmes, in his individual capacity)

187.    The Plaintiff repeats and reiterates the allegations of the foregoing paragraphs 1 through 186 and incorporates them by reference herein.

188.    The Defendant Holmes had a duty to refrain from defaming the Plaintiff.

189.    Notwithstanding his duty, Defendant Holmes made statements that damaged the Plaintiff's reputation, in violation of law.

190.    By his conduct, as more particularly described above, Defendant Holmes published untruthful and defamatory written statements in the Internal Affairs Investigation Report, which prejudiced and harmed the Plaintiff's professional reputation.

191.    The Defendant Holmes' actions were motivated by actual malice towards Plaintiff.

192.    The Defendant Holmes is liable to the Plaintiff for the violations of law set forth above.

193.    As a result, Plaintiff suffered damages in the form of severe emotional distress, reputational harm, and other damages to be proven at trial..

## COUNT VI
## TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONSHIP
### (Holmes and McNamara in their individual capacities)

194.    The Plaintiff repeats and reiterates the allegations of the foregoing paragraphs 1 through 193 and incorporates them by reference herein.

195.    The Plaintiff enjoyed an employment relationship with the Town of Stoughton.

196.    Defendants interfered with that relationship by, *inter alia*, reducing his paid time off, initiating a lengthy unwarranted internal affairs investigation into him, issuing an internal affairs report containing false information intended to damage his credibility and reputation, disciplining him, unlawfully withholding public and personnel records from him, denying him a disciplinary appeal, reducing and/or denying him opportunities to earn overtime or compensatory time, reducing his job duties and managerial responsibilities, making multiple defamatory oral and written statements intended to harm his reputation, creating a hostile work environment, and otherwise retaliating against him.

197.    The Defendants' actions were driven by improper motives towards the Plaintiff.

198.    The Defendants are liable to the Plaintiff for the violations of law set forth above.

199.    The Defendants knew or should have known that their conduct, more particularly described above, violated the law.

200.    As a result, Plaintiff suffered damages in the form of lost income, severe emotional distress, reputational harm, and other damages to be proven at trial.

## COUNT VII
## INVASION OF PRIVACY – M.G.L. c. 214 § 1B
### (Holmes in his individual capacity)

201.    The Plaintiff repeats and reiterates the allegations of the foregoing paragraphs 1 through 200 and incorporates them by reference herein.

202.    Plaintiff had a reasonable expectation that information concerning his internal affairs investigation would only be disclosed pursuant to Department policy.

203.    Holmes' disclosure of information concerning Plaintiff's internal affairs investigation to individuals not authorized to such information under the Department policy was unreasonable, substantial, and serious.

204.     As a result, Plaintiff suffered damages in the form of severe emotional distress, reputational harm, and other damages to be proven at trial..


WHEREFORE, Plaintiff prays the court to:

1.   ORDER the Defendants to pay the Plaintiff compensatory damages for lost wages, front pay, emotional distress, and reputational harm;

2.   ORDER the Defendants to pay punitive damages and Plaintiff's attorneys' fees and costs as allowed by law; and

3.   ORDER Any further relief as is just and necessary

**The Plaintiff demands a jury trial on all applicable issue.**


Respectfully submitted,
PLAINTIFF DANIEL CARMICHAEL,
By his attorneys,

_____/s/ Joseph Sulman_____
Joseph L. Sulman, BBO #663635
Law Office of Joseph L. Sulman
391 Totten Pond Road, Suite 402
Waltham, MA 02451
(617) 521-8600
jsulman@sulmanlaw.com

June 11, 2021